**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| RASHAYN K. HOLLEY, | : | |
|     Plaintiff, | : | |
| | : | |
| v. | : | C.A. No.:   23-CV-11390-ADB |
| | : | |
| MICHAEL RYDER, TERRENCE | : | |
| GAFFNEY, THOMAS DUFFY | : | |
| and DAN MEHLHOUSE, | : | |
| in their individual and official | : | |
| capacities, | : | |
|     Defendants. | : | |
| | : | |

**STATEMENT OF UNDISPUTED MATERIAL FACTS SUBMITTED IN COMPLIANCE WITH LR, D.MASS. 56.1 IN SUPPORT OF DEFENDANTS MICHAEL RYDER, TERRENCE GAFFNEY AND THOMAS DUFFY'S MOTION FOR SUMMARY <u>JUDGMENT</u>**

Pursuant to LR, D.Mass. 56.1, the following statement of undisputed material facts[1] is submitted in connection with Michael Ryder, Terrence Gaffney and Thomas Duffy's motion for summary judgment:

**I.      THE PARTIES**

1.      Plaintiff Rashayn Holley ("Holley") is a forty-four year old individual who, by his election, is representing himself in this action.   *See* Excerpts from the Deposition Transcript of Rashayn Holley, appended hereto and designated as "Attachment A[,]" pp. 6-7, 12.

2.      At the time of the arrest that underlies this action in October, 2018, Holley was thirty-

---

1 It is a familiar summary judgment principle that properly supported facts are to be construed in the light most favorable to the non-moving party or parties, in this instance the plaintiff.  *See Benoit v. Technical Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir. 2003).   Consistent with that requirement, this statement of facts constitutes a factual predicate that is not, or cannot be, disputed by the plaintiff or that reflects his version of events.   To the extent that factual disputes exist between or among the parties, the plaintiff's version is accepted for present purposes but, in doing so through this motion practice, the defendants do not concede the accuracy of that version for any other purposes.

1

seven years old, was 5'11" and weighed approximately 210 pounds.   *See* Attachment A, pp. 12-13.

3.      Holley completed the eleventh grade at Doherty High School, but was kicked out of the school at that point and sent elsewhere.   *See* Attachment A, p. 20.   Holley was not able to complete his high school education at the next institution because he was arrested and incarcerated, but he obtained his GED while incarcerated.   *See* Attachment A, pp. 20-21.

4.      Since he reached the age of adulthood, Holley testified that he has served several periods of incarceration.   *See* Attachment A, p. 16.   Although he is unsure how many sentences he has served since that time or how much time he has served from the time he was eighteen to the present day, Holley has indicated that, during that period from the age of eighteen to now, he has been incarcerated for more time than he has been free from incarceration.   *See* Attachment A, p. 16-17.

5.      During his deposition testimony, when told that he appears as an adult defendant in twenty-seven cases in Worcester District Court, Holley agreed that the number was "most likely" accurate.   *See* Attachment A, pp. 21-22.   Holley also agreed that it rings true that he has been indicted and faced criminal charges in Worcester Superior Court in seven cases.   *See* Attachment A, p. 23.

6.      Holley's criminal charges and convictions over the years have included possession of a large-capacity firearm and feeding device, possession of a ballistic vest, assault and battery, assault and battery with a dangerous weapon, armed robbery, drug possession and trafficking charges, motor vehicle charges, assault and battery on a correctional officer, possession of burglary tools, assault and battery on a police officer, assault, threats to commit crimes and

2

resisting arrest.   *See* Attachment A, 15-16, 21-22, 26-30; *see also* Attachment B, ¶ 6;

Attachment C, ¶ 6; Attachment D, ¶ 4.

7.      Defendant Michael Ryder began working as a police officer for the City of Worcester in

1987, and now is in his thirty-ninth year of service.   *See* Affidavit of Michael Ryder, appended

hereto and designated as "Attachment B[,]" ¶ 3.   From 2003 until 2025, a span of more than two

decades, Ryder was assigned to the Department's Vice Unit.   *See id.*, ¶ 4.

8.      Defendant Terrence Gaffney began working as a Worcester police officer twenty years

ago, in 2006.   *See* Affidavit of Terrence Gaffney, appended hereto and designated as

"Attachment C[,]" ¶ 3.   For several years, including the period of 2017-2018, Gaffney was

assigned to the Vice Unit.   *See id.*

9.      Defendant Thomas Duffy has been a Worcester police officer for twenty-nine years.   *See*

Affidavit of Thomas Duffy, appended hereto and designated as "Attachment D[,]" ¶ 3.   For

seventeen years until 2023, Duffy worked in the Gang Unit.   *See id.*

## II.     THE MATERIAL PRELUDE

10.     In 2007, two individuals were murdered in the City of Worcester.   *See* Attachment A,

pp. 68-69.   Holley indicated that the police wanted Holley to assist in the investigation but,

when he refused, he started to be identified as a suspect in the double homicide.   *See id.*, pp. 68-

70.   Holley has denied being involved in the murders.   *See id.*, pp. 69-70.

11.     Some years prior to 2018, an officer working for the Worcester Police Department Gang

Unit was conducting surveillance while attempting to locate a wanted felon.   *See* Attachment D,

¶ 5.   At that time, Holley appeared next to the officer's unmarked vehicle and began yelling

"what the fuck are you doing?" to the officer, at which point Holley went to the driver's side of

the car, telling the officer to get out of the car while calling him a "pussy cop." *Id.* Holley then tried opening the driver's door to the car and, upon discovering that the door was locked, began pounding on the vehicle and window while demanding that the officer get out of the car. *See id.* Holley told a group of individuals nearby that the police were watching them, which led to some of those persons approaching the officer's car as well. *See id.*

12. Holley was charged and indicted for several offenses, including assault and criminal threats. *See id.*, ¶ 6. Holley subsequently pled guilty to those and other contemporaneous charges that involved Holley threatening to murder a police officer and committing an assault and battery on the officer. *See id.*

13. In 2015, Holley was the subject of a joint investigation conducted by the Massachusetts State Police, the Shrewsbury Police Department and the Worcester Police Department. *See* Attachment A, pp. 16, 30-31, 45-46. Holley was arrested and later indicted for drug trafficking and firearms charges in connection with that investigation. *See* Attachment A, pp. 30-31.

14. According to Holley, while he did have possession of a quantity of cocaine and a morphine or opium patch, he did not possess any heroin and the trafficking charge related to heroin, morphine or opium was improper. *See* Attachment A, pp. 30-32.

15. Also in conjunction with that 2015 arrest, Holley claims that money and cocaine went missing after his interaction with law enforcement. *See* Attachment A, pp. 46-47. With respect to the cocaine, Holley testified that "I know what I had, you see. Call it whatever it is, but I know what I had." *Id.*, p. 46. Holley claims that fifty grams of his cocaine went missing and about $20,000 in cash is gone as well. *See id.*, 46-47.

16. In November, 2017, Holley and his cousin, Nathaniel Soucy, were arrested by members

4

of the Worcester Police Department and charged with sundry drug offenses, including cocaine trafficking and possession with intent to distribute. *See id.*, pp. 32, 35, 40, 45.

17.     Both Terrence Gaffney and Michael Ryder, assigned to the Vice Unit at the time, were involved in the investigation that led to the arrests of Holley and Soucy and Ryder was present when the arrests occurred. *See* Attachment B, ¶ 5; *see also* Attachment C, ¶¶ 4-5.

18.     On the day of the November, 2017 arrests, Holley said that he was leaving his house with his cousin, Nathaniel Soucy, when his vehicle was boxed in by a number of other vehicles and a contingent of officers with guns drawn began surrounding his car. *See id.*, pp. 32-33, 35-36, 39-40.

19.     Holley's testimony was that he was afraid that he was about to be shot as he was being told to turn his car off and exit the vehicle while one officer tried to smash his window. *See id.*, pp. 33-34.

20.     Holley further indicated during his deposition that, after he was removed from the vehicle and handcuffed, he was kneed three or four times in the head area. *See id.*, pp. 34, 36, 38-39. Holley could see faces of officers, but did not know a lot of their names at that point because he had been in prison for so long by November, 2017. *See id.*, p. 37.   As best he could tell, it was one officer who had kneed him in the head and that officer was white and heavy-set. *See id.*, p. 38.   Holley stated that, around the time he was being struck, he was being told to stop resisting but that officers had both of his arms at that time. *See id.*, p. 39.

21.     Holley does not believe that the November, 2017 arrest was handled appropriately. *See id.*, pp. 44, 48.   In addition to the unreasonableness of the knee strikes, Holley also claims that his drugs and money went missing following that arrest as well. *See id.*, pp. 44-48.   Holley

further has said that, according to police reports said that Holley gave officers his house key and told them that he wanted a lawyer—statements that Holley indicated are untrue.   *See id.*, pp. 44-45.

22.    In addition, Holley testified during his deposition that he was able to determine who the confidential informant was in connection with that case and he was able to learn that the informant was being paid with cocaine and heroin; according to Holley, the informant was going to testify for Holley that there were no drug sales by Holley to the informant.   *See id.*, pp. 63-64.

23.    Holley's cousin, Nathaniel Soucy, was arrested with Holley in November, 2017.   *See id.*, p. 40.   Soucy and Holley were represented by separate counsel and their criminal prosecutions mostly were handled independent of one another.   *See id.*, pp. 50-52.

24.    Appended hereto and designated as "Attachment E" is the Worcester District Court docket for *Commonwealth v. Rashayn Holley*, Worcester District Court Docket No. 1762CR008494.   That docket indicates that, in February, 2018, the District Court case was dismissed after Holley had been indicted in the Worcester Superior Court for the crimes.   *See* Attachment E; *see also* Attachment A, pp. 49-50.

25.    Appended hereto and designated as "Attachment F" is the Worcester Superior Court docket for *Commonwealth v. Rashayn Holley*, Worcester Superior Court Docket No. 1885CR00042.   That docket indicates, among other things, that when Holley was arraigned in Worcester Superior Court on February 16, 2018, one of the judicially-assigned conditions was GPS monitoring.   *See* Attachment F.

## III.    THE EVENTS OF OCTOBER, 2018

26.    As of October, 2018, the criminal charges against Holley arising out of his 2015 and

2017 arrests still were pending.    *See* Attachment A, p. 50.

27.    In fact, in August, 2018, Holley's attorney had filed a motion to suppress in the Superior

Court case associated with the November, 2017 arrest, arguing that all evidence deriving from

the November, 2017 motor vehicle stop of Holley should be suppressed.    A copy of the motion

to suppress is appended hereto and designated as "Attachment G[.]"

28.    The Superior Court docket associated with the November, 2017 arrest indicates that there

was a motion hearing held on October 11, 2018, which was a Thursday, and, based on the

docket, the only pending motion at that time was the motion to suppress.    *See* Attachment F.

Holley testified that, by that time, he believed that the informant he identified would be testifying

against the police officers, that information in the search warrant affidavits was untrue and that

money and drugs were missing.    *See* Attachment A, pp. 47, 96 and 99.

29.    The following day, Friday, October 12, 2018, Holley does not believe that he was

scheduled to work.    *See* Attachment A, p. 70.    Holley did not have a scheduled court

appearance on that day, but Soucy did.    *See* Attachment A, p. 82.

30.    On that date, Holley received a call from Soucy.    *See id.*, 82-83.    Soucy told Holley that

Soucy's attorney was stating that Holley intended to plea to the criminal charges that Holley

faced and, when Holley said that was untrue, Soucy said that Holley might want to come to the

Worcester courthouse, in which the District and Superior Courts are located, to straighten out the

situation.    *See id.*, pp. 82-84.

31.    Holley then went to the courthouse and, upon entering the building, saw Soucy on the

fourth floor.    *See id.*, pp. 86-87.

32.    Holley proceeded to the fourth floor of the courthouse and saw Soucy outside a

courtroom.  *See id.*, pp. 86-87.

33.     As he proceeded toward Soucy, Holley saw Officer Thomas Duffy with a number of individuals that he perceived to be police officers because they were with Duffy.  *See id.*, 88-89.

34.     Holley testified that he had to walk by that group of officers to get to Soucy and, when he passed, he did not say anything but "glanced over" at the group.  *See id.*, pp. 90-91.

35.     Michael Ryder, involved in the arrests of Holley and Soucy in 2017 and the investigation that preceded those arrests, was one of the individuals with Duffy that day.  *See* Attachment B, ¶¶ 5, 7.  Ryder, who knew that Soucy's case was scheduled for a hearing on that day, was there for an appearance in a separate criminal case.  *See* Attachment B, ¶ 7.

36.     Gaffney, who also was involved in the investigation that preceded the arrests of Holley and Soucy in 2017, was present in the courthouse that day for an appearance in the criminal prosecution of Soucy.  *See* Attachment C, ¶ 7.

37.     Duffy was not involved in the 2017 investigation or arrests of Holley and Soucy, but did have numerous prior interactions with Holley over the years and was present in the courthouse for an appearance on another criminal case.  *See* Attachment D, ¶¶ 4, 7.

38.     Jeffrey Carlson, now a lieutenant for the Worcester Police Department, also was present on the fourth floor of the courthouse that day for an appearance in a criminal matter.  Appended hereto and designated as "Attachment H" is the affidavit of Jeffrey Carlson, ¶ 3.

39.     Ryder and Gaffney both observed Holley come from the area of the elevators and walk toward a courtroom while glaring at their group of assembled officers.  *See* Attachment B, ¶ 8; *see also* Attachment C, ¶¶ 8-9.

40.     Holley entered the courtroom for a brief period and, understanding the Court to be in or

heading into a recess, left the courtroom and remained outside the courtroom.   *See* Attachment A, pp. 84-5, 93.

41.    Outside of the courtroom, Holley says that he was discussing with Soucy that the Assistant District Attorney was lying to Soucy's attorney because Holley was not going to plea to the charges he faced.   *See* Attachment A, pp. 91-92.   Holley, thinking to himself, "what the fuck[,]" believed that the Assistant District Attorney was not being honest and Holley did not understand in any event why the Assistant District Attorney would be discussing Holley's case with Holley's co-defendant's attorney.   *See* Attachment A, pp. 94-95.

42.    During that window of time, Holley says that he looked over at the group containing Duffy and other officers.   *See* Attachment A, p. 94-95.

43.    After Ryder's observations of Holley as Holley walked by him; *see* Attachment B, ¶ 8; Ryder saw Holley enter and exit the courtroom and, once outside the courtroom, remain in the area while continuing to direct his line of sight at the group of officers that included Ryder.   *See id.*, ¶ 8.

44.    Gaffney made a similar series of observations after watching Holley stare at him as he passed by initially.   *See* Attachment C, ¶¶ 8-9.   Gaffney saw Holley enter and leave the courtroom, then remaining outside the courtroom while glaring at the group that included him, Ryder and Duffy.   *See* Attachment C, ¶ 9.

45.    Carlson, who was aware of Holley owing to Holley's interactions with law enforcement over the years, also saw Holley exit the courtroom and begin staring in the direction of the group of officers.   *See* Attachment H, ¶ 4.

46.    Holley recalls Soucy's lawyer coming over to he and Soucy and advising that the case

was going to be continued, at which point Holley and Soucy prepared to leave.   *See* Attachment A, pp. 92-93.

47.    Gaffney, who was there on the Soucy matter, also was told that the case would be continued at that time.   *See* Attachment C, ¶ 10.   Simultaneously, Duffy and Ryder also were dismissed for the day.   *See* Attachment B, ¶ 9; *see also* Attachment D, ¶ 7.

48.    Ryder, Gaffney, Duffy and Webster police officer Daniel Mehlhouse all then proceeded to the elevators on the fourth floor of the courthouse to go downstairs and leave the building. *See* Attachment B, ¶ 10; *see also* Attachment C, ¶ 10; Attachment D, ¶ 7.

49.    Carlson, who had not been dismissed in connection with his court appearance that day, remained on the fourth floor of the courthouse.   *See* Attachment H, ¶ 5.

50.    After the police officers headed to the elevators, Carlson observed Holley and Soucy walking away from the courtroom area where they had been located and, as Soucy headed toward the stairs, Carlson saw Holley motion with his hand and appear to say something to Soucy.   *See* Attachment H, ¶ 6.   Soucy then changed direction and walked with Holley toward the same area of the elevators where the officers were.   *See* Attachment H, ¶ 6.

51.    Holley materially agrees.   During his deposition, Holley said that, as he and Soucy were leaving, Soucy asked if he wanted to take the stairs and Holley said no, because of his back, he did not want to take the stairs.   *See* Attachment A, pp. 103-04.

52.    Ryder, Gaffney, Duffy, Mehlhouse, Holley and Soucy all went onto the same elevator. *See* Attachment A, pp. 104-05; *see also* Attachment B, ¶ 10; Attachment C, ¶ 12; Attachment D, ¶¶ 7-8.

53.    Carlson, who observed the change of course by Holley and Soucy, grew concerned about

why Holley redirected Soucy to the elevators and he changed his position on the fourth floor so that he would be able to see the area where the elevator would open on the first floor in order to assist if needed when the elevator arrived there.   *See* Attachment H, ¶ 7.

54.    On the elevator, Ryder and Gaffney similarly were alarmed.   Ryder was personally aware of the criminal histories of Soucy and Holley, which featured several crimes of violence to include firearms charges and offenses against law enforcement officers.   *See* Attachment B, ¶ 6. Ryder also was aware that Holley was a suspect in a double homicide in Worcester.   *See* Attachment B, ¶ 6.   Gaffney was similarly possessed of information concerning the criminal past of both Soucy and Holley.   *See* Attachment C, ¶ 6.   Duffy additionally was involved in or present for a number of violent incidents associated with Holley over the years and knew of Holley's propensity for violence toward law enforcement.   *See* Attachment D, ¶¶ 4-5.

55.    Compounding the concern was that the law enforcement officers on the elevator all were armed, which meant that their firearms would be readily accessible not only to themselves, but also to Soucy or Holley.   *See* Attachment B, ¶ 16; *see also* Attachment C, ¶¶ 13, 16; Attachment D, ¶ 10.   Holley testified at his deposition that he knew all of the officers were armed and that the closest gun to him would have been three or four feet away.   *See* Attachment A, pp. 117-8.

56.    Soucy and Holley both are large men, with Ryder and Gaffney gauging that they both were approximately 5'10" with Soucy weighing about 260 pounds and Holley about 200 pounds. *See* Attachment B, ¶ 12; *see also* Attachment C, ¶ 14.   Holley agrees as to his size at the time, placing himself at 5'11" and weighing 210 pounds.   *See* Attachment A, pp. 12-13.

57.    As Gaffney puts it, there were six adult men in a tight, enclosed space with four of those men armed with firearms and the other two men who were not handcuffed, had violent pasts and

had open criminal cases that involved officers on the same elevator.   *See* Attachment C, ¶ 15.

58.    Holley places himself in the back of the elevator, with Soucy to his left and Duffy to Soucy's left.   *See* Attachment A, p. 105.

59.    Gaffney recalls that Holley was not facing toward the front of the elevator and was facing the area of the elevator where Gaffney and Ryder, the two individuals involved in the investigation that led to Holley's 2017 arrest, were located.   *See* Attachment C, ¶ 13.

60.    That caused Gaffney to position himself so that he was facing Holley and Soucy so as to give himself a chance to observe if Holley or Soucy took any threatening action, including any attempt to disarm Gaffney or another officer.   *See* Attachment C, ¶¶ 13-16.

61.    Ryder similarly recalls Holley facing and glaring at Ryder on the elevator.   *See* Attachment B, ¶¶ 13-14.   Ryder took that, in combination with the earlier glaring, to be an attempt at intimidation.   *See* Attachment B, ¶ 13.

62.    The doors closed and the elevator began to move.   *See* Attachment C, ¶ 17.

63.    It was at that point that Holley, who said he was facing Ryder, says that he recognized Ryder.   *See* Attachment A, p. 105.   Specifically, Holley testified that "So we're all in the elevator and standing there.   And I'm looking at him, and I recognized him."   *See id.*

64.    Holley said that he recognized Ryder from his 2017 arrest and said, "[h]ey, aren't you the one that was kneeing me in my head when I was being handcuffed—oh, no, when I was handcuffed?"   *See* Attachment A, pp. 105-06.

65.    Ryder and Gaffney heard the accusation by Holley.   *See* Attachment B, ¶ 14; *see also* Attachment C, ¶ 17.   According to Ryder, he responded by saying that he did not know what Holley was talking about in terms of the accusation.   *See* Attachment B, ¶ 14.   To hear Holley

tell it, Ryder's response was "[s]o what if I was?"   Attachment A, p. 106.

66.    Holley responded by saying "you're a pussy."   *See* Attachment A, p. 107; *see also* Attachment B, ¶ 14; Attachment C, ¶ 18; Attachment D, ¶ 9.

67.    As he said it, Holley appeared to Ryder to puff his chest confrontationally and Ryder thought that Holley was going to advance physically on Ryder.   *See* Attachment B, ¶ 17.

68.    For Ryder, Holley was attempting to place Ryder in fear for his physical safety and intimidate him and other officers, beginning from the staring on the fourth floor to the courthouse and continuing through his staring at Ryder on the elevator and this attempt to confront Ryder once the elevator doors was closed and no one could go anywhere.   *See* Attachment B, ¶¶ 15, 19.

69.    Gaffney shared the same concerns given the totality of the circumstances, including the doors now being shut on the elevator.   *See* Attachment C, ¶ 18-19.

70.    Duffy thought the same—that Holley was attempting to confront Ryder in a confined space owing to Ryder's open case with Holley at that time.   *See* Attachment D, ¶¶ 8-10.   For Duffy, Holley's behavior was assaultive and an attempt to intimidate the officers in the elevator. *See* Attachment D, ¶ 13.

71.    The word choice from Holley also was significant.   Years prior, Holley had called an officer a "pussy cop" as Holley was yelling for the officer to get out of his car, then attempting to open the driver's door where the officer was located before pounding on the vehicle and windshield and telling the officer to get out.   *See* Attachment D, ¶ 5.

72.    Duffy, based upon the circumstances, decided that immediate action would need to be taken and he moved to Holley to place him in custody.   *See* Attachment D, ¶ 11.   Gaffney

thought the same and he moved toward Holley to be in a position to control Holley's actions. *See* Attachment C, ¶ 18.   Ryder informed Holley that he was under arrest.   *See* Attachment B, ¶ 17.

73.    Holley testified that Duffy came around Soucy, came into contact with Holley and, spun him around on the elevator to handcuff Holley.   *See* Attachment A, p. 107.   According to Holley, Duffy was "talking shit" and trying to choke Holley from behind while an officer was on either arm of Holley.   *See* Attachment A, pp. 107-09.

74.    Holley says that when the elevator doors opened, he was brought out while Duffy was calling him a "fucking piece of shit" and saying that he would lock Holley up for the rest of his life.   *See* Attachment A, pp. 108-09.

75.    When asked what he did to be arrested, Mehlhouse told Holley to shut the fuck up and that Holley knew not to talk to police as he did.   *See* Attachment A, pp. 109, 136-37.

76.    Carlson, from the fourth floor, could hear yelling on the elevator and made his way to the first floor—once he arrived Holley already was in handcuffs.   *See* Attachment H, ¶ 8.

77.    Principally engaged verbally with Duffy, Holley reported that Duffy was continuing to yell at him while Holley might have responded with phrases directed toward Duffy like "fuck you," "if you want to see me, you're going to see me."   Attachment A, p. 110.

78.    Holley also testified that he might have called Duffy a pussy as the transport wagon was en route and that, when Duffy said he would beat the shit out of Holley, Holley might have said that he is not afraid to lose a fight, that Duffy would do whatever he was going to do and that Holley was a man who would step to Duffy like a man.   *See* Attachment A, pp. 135-36.

## IV.    THE RELEVANT POSTSCRIPT

79.    During his deposition, Holley testified that, after his arrest on Friday, October 12, 2018, he was held over the weekend until Monday, October 15, 2018, when he had his initial appearance in court.   *See* Attachment A, pp. 138-39.   He indicated that, at the initial appearance, his lawyer requested the preservation of video footage from the courthouse but there was no video surveillance working in the courthouse on October 12, 2018.   *See* Attachment A, p. 139.

80.    Of note, while Holley's complaint asserted that he was held from October 12, 2018 until December, 2015, Holley corrected that assertion during his deposition as an error.   *See* Attachment A, pp. 150-51.

81.    Appended hereto and designated as "Attachment I" is the Worcester District Court docket for *Commonwealth v. Rashayn Holley*, Worcester District Court Docket No.   1862CR007436.

82.    According to the docket and Holley's testimony, Holley was released following his initial appearance on October 15, 2018 on personal recognizance.   *See* Attachment I; *see also* Attachment A, pp. 150-51.

83.    Appended hereto and designated as "Attachment J" is the order of pretrial conditions of release issued in connection with the same action.   The conditions imposed were that Holley was to:   (1) obey all laws and court orders; (2) notify the probation department if his contact information changed; (3) make no false statements to a probation officer; (4) sign releases to verify compliance or as directed by the probation department; (5) refrain from possession of firearms, destructive devices or dangerous weapons; (6) have no contact with the police officers; (7) maintain 100 yards of distance from the involved officers; (8) report to probation once a

15

week; and, (9) comply with the Superior Court GPS order.   *See* Attachment J.

84.     As to the Superior Court GPS monitoring, Holley testified that he already had that condition imposed in connection with his earlier prosecutions when he was arrested in October, 2018.   *See* Attachment A, p. 142.

85.     According to the docket, Holley was charged with three counts of a violation of G.L. c. 268, § 13B and one charge of assault in violation of G.L. c. 165, § 13A (a).

86.     In April, 2019, Holley's attorney filed a motion to dismiss, along with a supporting memorandum of law, arguing that all four criminal charges ought be dismissed owing to a lack of probable cause.   A copy of the motion to dismiss material is appended hereto and designated as "Attachment K[.]"

87.     Following a hearing on May 23, 2019, the motion to dismiss was allowed on the assault charge and denied as to the three counts of intimidation in violation of § 13B.   *See* Attachment I.

88.     Beginning in August, 2019, there are docket notations concerning habeas corpus filings for Holley's attendance in court.   *See* Attachment I.

89.     Holley testified that, in August, 2019, he pled guilty to the criminal charges arising out of his 2015 and 2017 arrests.   *See* Attachment A, p. 52.   Holley received a sentence of eight to ten years in prison, which is the sentence he presently is serving.   *See* Attachment A, pp. 13-14, 52.

90.     Those habeas notations, Holley has said, are attributable to his guilty plea and sentence in connection with the 2015 and 2017 sets of charges, not this arrest from October, 2018.   *See* Attachment A, pp. 148.

91.     After his motion to dismiss was allowed as to one charge and denied as to three, Holley proceeded to trial on the remaining charges and was found not guilty.   *See* Attachment I.

92.    With respect to this action and the claims presented, during his deposition Holley testified that he is aware that certain claims and defendants do not remain in the case and, as to what does remain, he believes that he has a federal malicious prosecution claim and, possibly, a state malicious prosecution claim as well.   *See* Attachment A, pp. 170-72.

DEFENDANTS RYDER, GAFFNEY AND DUFFY,
By their attorney,

/s/ Andrew J. Gambaccini
Andrew J. Gambaccini, BBO #:   654690
Vigliotti, Gambaccini & Akerson, P.C.
28 Park Avenue, Suite 2
Worcester, MA 01605
508.635.9911
agambaccini@vgalawpc.com